**Opinion issued November 21, 2012.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-11-00347-CR

———————————

**BRENT CORWIN BULLOCK, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the County Criminal Court at Law No. 7**
**Harris County, Texas**
**Trial Court Case No. 1695910**

---

## O P I N I O N

Brent Corwin Bullock pled guilty to the misdemeanor offense of driving while intoxicated. In a single issue, he challenges the trial court's pretrial ruling on his motion to suppress evidence. We affirm.

**Background**

Officer Jordan of the Houston Police Department pulled Bullock after witnessing Bullock change lanes several times by "gradually . . . drift[ing]" from the far left lane, into the middle lane, and then into the far right lane without signaling. Jordan suspected that Bullock might be intoxicated from the nature of his driving. This suspicion grew stronger when it took Bullock an unusual length of time to pull over after Jordan turned on his emergency lights.

The traffic stop began at 1:02 a.m. Before approaching the vehicle, Officer Jordan ran the vehicle's license plate through the system. He estimated that it took him a few minutes before he approached the vehicle. Upon approaching the vehicle, Officer Jordan smelled alcohol. Jordan also noted that Bullock's eyes were "glassy" and "bloodshot." When he requested Bullock's driver's license and proof of insurance, he noticed that Bullock appeared disoriented and had difficulty understanding the request. Bullock then unsuccessfully attempted to retrieve his driver's license and proof of insurance from his glove box. Jordan described Bullock as "fumbling back and forth" in an effort to unlock the glove box, at one point attempting to take the key out of the vehicle's ignition while the vehicle was still in drive. "[T]hen he reached back to the back seat as if he had forgotten. He went back and forth for a while."

Officer Jordan then asked Bullock to get out of his vehicle. Jordan estimated that Bullock spent approximately a minute and a half attempting to open the glove box and estimated the entire length of time he spent outside Bullock's car before asking Bullock to exit the vehicle as "2 or 3 minutes." At 1:08 a.m., Jordan requested dispatch of a DWI task force officer to the scene. After calling for a DWI task force officer, Jordan asked Bullock a few questions about whether he had consumed alcohol that evening and administered a field sobriety test—the horizontal gaze and nystagmus (HGN) test—during which Bullock exhibited all six signs of intoxication. Jordan testified that it took him "2 or 3 minutes" to administer the HGN test and that he spent approximately ten to fifteen minutes questioning Bullock. He stated that "[i]t took a little longer because [Bullock] had some difficulty understanding questions." After administering the test and questioning Bullock, Jordan handcuffed Bullock and detained him in the backseat of his patrol car. Jordan testified that he placed Bullock in the back of his patrol car between 1:10 and 1:45 and that Bullock remained in the back of the patrol car for "about 15 minutes or so."

At 1:25 a.m., the DWI unit advised Officer Jordan that the DWI task force officer initially dispatched to the scene had been "preempted," meaning that he had been taken off the call and was no longer en route. Jordan then renewed the request for dispatch of a task force officer, and at 1:32 a.m., DWI task force Officer Silman

3

was dispatched to the scene. Officer Silman arrived at the scene at 1:45 a.m., at which time Bullock was taken out of Jordan's squad car so that Officer Silman could conduct his investigation. Silman questioned Bullock and administered field sobriety tests. After completing his investigation of Bullock, Officer Silman arrested Bullock, at which time it was approximately 2:20 a.m.

The State charged Bullock with the misdemeanor offense of driving while intoxicated (DWI). Bullock filed a motion to suppress evidence obtained by the State during his detention, which he contended was unreasonable in duration. The trial court denied the motion to suppress. Bullock then pled guilty to DWI. The trial court sentenced him to 180 days' incarceration, probated for twelve months, and assessed a fine of $300. The trial court certified Bullock's right to appeal the ruling on his motion to suppress, and this appeal followed.

## Reasonableness of Detention Duration

Bullock contends that his seventy-eight minute detention was unreasonable in duration, and thus the trial court should have suppressed any evidence obtained as a result of the detention.

## A. Standard of review

In reviewing the trial court's ruling on a motion to suppress evidence, we apply a bifurcated standard of review. *See Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). We review the evidence in the light most favorable to the

4

trial judge's ruling and give "almost total deference" to the trial judge's determinations of historical facts and rulings on mixed questions of law and fact that depend on an evaluation of credibility and demeanor. *Gonzales v. State*, 369 S.W.3d 851, 854 (Tex. Crim. App. 2012); *Carmouche*, 10 S.W.3d at 327. But we apply a de novo standard of review to the application of search and seizure law and to mixed questions of law and fact that do not depend on credibility and demeanor. *Gonzales*, 369 S.W.3d at 854; *Carmouche*, 10 S.W.3d at 327.

**B.     Reasonableness of duration**

The Fourth Amendment prohibits unreasonable searches and seizures, and this limitation is implicated by a law enforcement officer's detention of motorists during a traffic stop. *See, e.g.*, *Arizona v. Johnson*, 555 U.S. 323, 326–27, 129 S. Ct. 781, 784 (2009); *Garcia v. State*, 827 S.W.2d 937, 943–44 (Tex. Crim. App. 1992). A law enforcement officer may lawfully stop and detain a motorist who commits a traffic violation. *See Arizona*, 555 U.S. at 327, 129 S. Ct. at 784; *Garcia*, 827 S.W.2d at 944; *Johnson v. State*, 323 S.W.3d 561, 563 (Tex. App.— Eastland 2010, pet. ref'd). A traffic stop generally constitutes an "investigative stop" or a "*Terry* stop" under *Terry v. Ohio*, 392 U.S.1, 88 S. Ct. 1868 (1968). *See Johnson*, 555 U.S. at 327, 129 S. Ct. at 784. But the length of the detention must be reasonable in relation to the officer's investigation; at some point, a detention may

become too long in duration to be justified as an investigative stop. *See United States v. Sharpe*, 470 U.S. 675, 683–88, 105 S. Ct. 1568, 1574–77 (1985).

There is no bright line rule as to how long a traffic stop may reasonably continue; instead, courts consider "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe*, 470 U.S. at 686–87, 105 S. Ct. at 1575–76; *see United States v. Brigham*, 382 F.3d 500, 511 (5th Cir. 2004) (en banc) ("There is . . . no constitutional stopwatch on traffic stops. Instead, the relevant question in assessing whether a detention extends beyond a reasonable duration is 'whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.'") (quoting *Shapre*, 470 U.S. at 686, 105 S. Ct. at 1575); *Kothe v. State*, 152 S.W.3d 54, 65 n.42 (Tex. Crim. App. 2004) (quoting *Brigham* for same). In making this assessment, courts must "take care to consider whether the police are acting in a swiftly developing situation" and may not "indulge in unrealistic second-guessing" at alternative means by which the police might have accomplished their objectives more efficiently or less intrusively. *Sharpe*, 470 U.S. at 686–87, 105 S. Ct. at 1575–76. "The fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, itself, render the search unreasonable." *Id.* (quoting *Cady v. Dombrowski*, 413 U.S. 433, 447, 93 S. Ct. 2523, 2531 (1973)).

6

"[C]ommon sense and ordinary human experience must govern over rigid criteria." *Belcher v. State*, 244 S.W.3d 531, 539 (Tex. App.—Fort Worth 2007, no pet.) (citing *Sharpe*, 470 U.S. at 685, 105 S. Ct. at 1575).

Reasonableness under the Fourth Amendment is determined by balancing the public interests served against the individual's Fourth Amendment rights, and courts therefore consider the legitimate law enforcement purposes served by asserted delays in an officer's investigative stop. *See Sharpe*, 470 U.S. at 685, 105 S. Ct. at 1575; *Kothe*, 152 S.W.3d at 63; *Belcher*, 244 S.W.3d at 539. During a traffic stop, an officer may request information such as a driver's license and vehicle registration, and may conduct a computer check of that information. *See Kelly v. State*, 331 S.W.3d 541, 549 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (citing *Kothe*, 152 S.W.3d at 63); *Johnson*, 323 S.W.3d at 563 (citing *Kothe*, 152 S.W.3d at 63 and *Parker v. State*, 297 S.W.3d 803, 809 (Tex. App.—Eastland 2009, pet. ref'd)); *Spight v. State*, 76 S.W.3d 761, 766 (Tex. App.—Houston [1st Dist.] 2002, no pet.). While the officer is awaiting a computer warrant check, questioning about matters unrelated to the initial traffic stop does not violate the Fourth Amendment because such questioning does not extend the duration of an initial valid stop. *Johnson*, 323 S.W.3d at 563 (citing *Parker*, 297 S.W.3d at 809). "Texas courts likewise have held that a delay in an officer's required investigation to confirm or dispel the officer's suspicions of the suspect and a resultant

7

prolonged detention is reasonable under the Fourth Amendment when the delay furthers legitimate law enforcement purposes." *Belcher*, 244 S.W.3d at 539 (citing *Hartman v. State*, 144 S.W.3d 568, 573 (Tex. App.—Austin 2004, no pet.)).[1]

We apply these standards to determine whether Bullock's Fourth Amendment rights were violated by an unreasonable detention by the police before his DWI arrest.

### 1. Delay while waiting for DWI task force officer

Bullock does not challenge Officer Jordan's justification for stopping him for failure to signal a lane change or Officer Jordan's initial detention of him to investigate a reasonable suspicion that he was intoxicated. But Bullock contends that Officer Jordan's investigation only accounts for ten to fifteen minutes of Bullock's seventy-eight minute detention and that the remaining time was an unreasonable delay. The evidence does not support this contention.

Officer Jordan's testimony establishes that between 1:06 a.m., when Jordan stopped Bullock, and 1:45 a.m., when Officer Silman arrived, Jordan performed multiple tasks routinely performed by police in a traffic stop: he ran the license plate of Bullock's vehicle; he requested Bullock's driver's license and insurance information, which Bullock was initially unable to provide because he was unable

---

[1] *See also Smith v. State*, No. 03–06–00085–CR, 2007 WL 700834, at *3–4 (Tex. App.—Austin Mar. 7, 2007, pet. ref'd) (mem. op., not designated for publication).

8

to unlock his glove compartment; he requested that a DWI task force officer be sent to the scene, and when the first DWI officer dispatched was preempted, he renewed his request for a DWI officer; he asked Bullock to step out of the car after Bullock showed signs of intoxication; he questioned Bullock about his activities that evening, particularly any alcohol consumption; he performed an HGN test; he assisted Bullock in unlocking the glove compartment so that he could retrieve his driver's license and insurance information; and he handcuffed Bullock and placed him in the back of the patrol car.

Jordan testified as to the timing of many of these tasks. He estimated that it took him a few minutes to run the plates and that he spent another "2 or 3 minutes" standing at Bullock's car before asking Bullock to exit the vehicle—this includes the time during which Jordan requested Bullock's driver's license and insurance papers and Bullock attempted unsuccessfully to retrieve them from his glove compartment. Jordan testified that his questioning of Bullock outside the car took approximately ten to fifteen minutes. He also testified that it took him "2 or 3 minutes" to administer the HGN test, though it is unclear whether this time is included within the approximately fifteen minutes Jordan spent questioning Bullock outside of the vehicle.[2] He estimated that the amount of time Bullock spent

---

[2] At one point Jordan testified separately about spending ten to fifteen minutes questioning Bullock and several minutes administering the test, but at another time Jordan testified that his investigation took between ten and fifteen minutes from

in the back of his patrol car awaiting Officer Silman's arrival was approximately fifteen minutes. This is consistent with his other testimony, which specifically accounts for up to approximately twenty of the thirty-nine minutes between Officer Jordan's initial stop and Officer Silman's arrival. We therefore turn to whether a delay of approximately fifteen minutes while waiting for a DWI task force officer is reasonable in terms of both purpose and duration.

### a. Legitimate law enforcement purposes

Officer Jordan testified as to the reasons that he requested a DWI task force officer to complete the DWI investigation on Bullock. He testified that it was HPD's general procedure for a patrol officer to call a DWI task force officer when there was a possible DWI. He further testified that the police department was "very shorthanded on patrol," particularly at night, and thus they tried to use the DWI unit whenever possible so that patrol cars would be available for their primary responsibility of responding to service calls and emergencies. He also stated that the DWI unit officers were more experienced in DWI investigations, were usually able to conduct a DWI investigation more quickly than patrol officers, and had primary responsibility for conducting DWI investigations.

---

the time he got Bullock out of the vehicle, which would include the "few minutes" Jordan spent administering the HGN.

We conclude that the delay in Bullock's detention furthered legitimate law enforcement purposes—specifically, ensuring that an adequate number of patrol cars are available to respond to emergency calls and utilizing a DWI unit that has greater experience in investigating DWIs and can perform such investigations with greater expediency. *See Belcher*, 244 S.W.3d at 539–41 (holding that delay while awaiting arrival of DWI enforcement officer was for legitimate law enforcement purposes because DWI officer was more experienced and could complete DWI investigation faster); *Hartman*, 144 S.W.3d at 573–74 (holding that delay while awaiting arrival of video camera to record DWI investigation, as per department policy, was for legitimate law enforcement purposes).[3]

### b. Reasonableness of length of delay

When a traffic stop detention is prolonged by a reasonable delay to comply with legitimate police policy, no Fourth Amendment violation has occurred. *See*

---

[3] *See also Wilson v. State*, No. 05-08-00802-CR, 2009 WL 4756562, at *2 (Tex. App.—Dallas Dec. 14, 2009, no pet.) (holding that legitimate law enforcement interests were served by local police officer's delay while waiting for state police officer to arrive to conduct DWI investigation because state officers had more DWI experience and local officers needed to be available to respond to emergencies); *Smith*, 2007 WL 700834, at *3–4 (holding that delay while awaiting arrival of rookie officer for on-the-job training in DWI investigation was for legitimate law enforcement purposes); *Dickson v. State*, No. 03–06–00126–CR, 2006 WL 3523789, at *3–4 (Tex. App.—Austin Dec. 6, 2006, no pet.) (mem. op., not designated for publication) (holding that delay while awaiting arrival of DWI enforcement officer, even though officer who initiated the stop was qualified to perform DWI investigation, was for legitimate law enforcement purposes because DWI officer brought greater expertise to scene and could complete DWI investigation more rapidly).

11

*Belcher*, 244 S.W.3d at 539; *Hartman*, 144 S.W.3d at 573.[4] But the duration of the delay must be reasonable in light of the law enforcement purposes served. Texas courts of appeals that have reviewed delays for the same law enforcement purposes at issue here—increased experience and expediency in conducting DWI investigations and the need to have officers available to respond to emergency calls—have found delays of twenty minutes or more were reasonable with respect to the public policies served. *See Belcher*, 244 S.W.3d at 541–42 (holding twenty-seven minute delay while waiting for DWI officer did not violate Fourth Amendment).[5] The delay here was approximately fifteen minutes—shorter than the delays in these cases. Like the delay in *Belcher*, the delay here was reasonable in light of the public policies served by the role of the DWI task force. *See Belcher*, 244 S.W.3d at 541–42.[6]

### 2. Duration of DWI task force officer's investigation

Bullock also asserts that "the record is silent as to . . . what [Officer Silman] did for the 35 minutes that he was on the scene." The record does establish that

---

[4]     *See also Smith*, 2007 WL 700834, at *3–4.

[5]     *See also Wilson*, 2009 WL 4756562, at *2 (holding delay of thirty to thirty-five minutes waiting for state police to conduct DWI investigation, during which time some investigation by local officer occurred, did not violate Fourth Amendment); *Dickson*, 2006 WL 3523789, at *1, 3–4 (holding that twenty-minute delay while waiting for DWI officer did not violate Fourth Amendment).

[6]     *See also Wilson*, 2009 WL 4756562, at *2; *Dickson*, 2006 WL 3523789, at *3–4.

Officer Silman's investigation and arrest of Bullock took thirty-five minutes, but it is not silent as to what Silman did during his investigation. The record includes Silman's arrest report, which demonstrates that during his thirty-five minute investigation, Silman questioned Bullock about whether he had consumed alcohol, what kind of alcohol he had consumed, what brand of beer, how many alcoholic drinks he had consumed, how many ounces the drink was, the establishment at which he had consumed alcohol, when he had last consumed food, what he ate at that time, where he ate, what his medical condition was, whether he had ever had a concussion, whether he had any permanent injuries, whether he was taking any medication at the time, where he had been immediately before the traffic stop, and where he was headed at the time of the stop. It shows that during this time Officer Silman observed that Bullock had a "strong" scent of alcohol on his breath, slurred speech, red and glossy eyes, an unsteady gate, and swaying balance.

The report further shows that Officer Silman conducted an HGN field sobriety test on Bullock two times and that Bullock "wouldn't follow with eyes" the first time but completed the test the second time. During these tests, Silman observed all six signs of intoxication. Silman also performed the "one leg stand" field sobriety test on Bullock twice. During these test Bullock swayed, used his arms, and dropped his foot seven times—three times during the first test and four times during the second test. Finally, Silman administered the "walk and turn"

13

field sobriety test to Bullock twice. During these tests, Bullock started early both times, was unable to keep his balance both times, stepped off the line twice during the first test and once during the second test, used his arms for balance during both tests, missed the heel-to-toe connection three times during the first test, turned incorrectly during both tests, and took twelve incorrect steps during the first test and sixteen incorrect steps during the second test. According to Silman's report, Bullock "started urinating on himself" at the completion of the standardized tests, after which Silman arrested him and transported him to "central intox."

We conclude that thirty-five minutes was not an unreasonable amount of time to spend on questioning Bullock and administrating six field sobriety tests, as described in Officer Silman's report. *See Balentine v. State*, 71 S.W.3d 763, 771 (Tex. Crim. App. 2002) (holding investigative detention of thirty to sixty minutes reasonable for questioning); *Josey v. State*, 981 S.W.2d 831, 845 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd) (permitting ninety-minute detention because officers did not continue to hold appellant after all legitimate components of investigative detention had been completed).[7]

We overrule Bullock's sole issue.

---

[7]     *See also Lenzy v. State*, No. 01-00-00904-CR, 2001 WL 1136713 (Tex. App.—Houston [1st Dist.] Sept. 27, 2001, no pet.) (not designated for publication) (holding that twenty-seven-minute detention for DWI investigation after traffic stop was not unreasonable).

14

## Conclusion

We hold that Bullock's Fourth Amendment rights were not violated by an unreasonable delay in his detention by the police. We therefore affirm the trial court's judgment.

<br>

Harvey Brown
Justice

Panel consists of Justices Keyes, Massengale and Brown.

Publish.   TEX. R. APP. P. 47.2(b).