02-12-187-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT
 OF APPEALS
 SECOND
 DISTRICT OF TEXAS
 FORT
 WORTH
  
 
 


 

 

NO. 02-12-00187-CR

 

 









 
 
 Melinda R. Howard
  
  
  
 v.
  
  
  
 The State of Texas
 
 
 §
  
 §
  
 §
  
 §
  
 §
 
 
 From County
 Criminal Court No. 2
  
 of Denton County (CR-2011-07177-B)
  
 March 14, 2013
  
 Opinion by Justice McCoy
  
 (nfp)
 
 


 

JUDGMENT

 

          This court has considered
the record on appeal in this case and holds that there was no error in the
trial court’s judgment.  It is ordered that the judgment of the trial court is
affirmed. 

 

SECOND
DISTRICT COURT OF APPEALS 








 

 

 

 

By_________________________________

    Justice Bob McCoy

 

 

 

 

 








 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT
 OF APPEALS
 SECOND
 DISTRICT OF TEXAS
 FORT
 WORTH
  
 
 


 

 

NO. 02-12-00187-CR

 

 


 
 
 MELINDA R. HOWARD
 
 
  
 
 
 APPELLANT
 
 


                                                                                                                             

V.

 


 
 
 THE
 STATE OF TEXAS
 
 
  
 
 
 STATE
 
 


 

 

------------

 

FROM COUNTY CRIMINAL COURT NO. 2 OF DENTON COUNTY

 

------------

 

MEMORANDUM OPINION[1]

 

------------

I.  Introduction

          In one issue, Appellant Melinda
R. Howard appeals the denial of her motion to suppress and subsequent conviction
of driving while intoxicated (DWI).  We affirm.

II.  Procedural Background

          After her arrest for DWI, Howard
filed a motion to suppress, which the trial court denied after a hearing,
entering the following fact findings:

1.   Lewisville Police Officer Christopher Clements was
on patrol in the City of Lewisville, Denton County, Texas, sometime before 1:00
a.m. on July 2, 2011.  Officer Clements is a certified peace officer.  Officer
Clements is certified to administer the Standardized Field Sobriety Tests,
including the Horizontal Gaze Nystagmus test.

 

2.   Officer Clements was dispatched to 1071 W[.] Round
Grove Road, a public place, located in Lewisville, Denton County, Texas around
12:54 a.m. in reference to a possible intoxicated driver.

 

3.   Civilian
911 caller Jeff Cott reported that he had observed a vehicle driving through
the parking lot and strik[ing] a curb.  Officer Clements observed a silver or
tan pickup truck in the parking lot . . . matching the description of the vehicle
that the 911 caller described.  The vehicle had a flat tire.  The pickup truck
is a motor vehicle.

 

4.   Officer
Clements approached the truck, without the use of any lights or sirens from his
patrol vehicle.  Officer Clements made no show of authority as he approached
the subjects.

 

5.   When
Officer Clements arrived, he observed two people, a male and a female.  The
male, later identified as passenger William Taylor, was attempting to change
the vehicle’s tire.  Officer Clements approached the male and asked him what
happened.  Mr. Taylor told Officer Clements that “she hit a curb.”  Officer
Clements had the female, later identified as Melinda Howard, step away from the
vehicle.

 

6.   While
speaking with Ms. Howard, the defendant, Officer Clements noticed an odor of
alcoholic beverage coming from the defendant’s breath and that her speech was
slurred and thick-tongued.

 

7.   Ms. Howard admitted to Officer Clements that she had
been driving through the parking lot and that she had been drinking alcohol
that evening.  She also told Officer Clements that she had taken two (2)
Tylenol PM pills 45 minutes prior.

 

8.   Officer Clements believed at that time that, under
the totality of the circumstances observed, that the defendant may have been
driving while intoxicated and preceded to further investigate Ms. Howard for
the offense of Driving While Intoxicated.

 

9.   Officer
Clements asked the Defendant to perform the Standardized Field Sobriety Tests
as well as two non-standardized field sobriety tests.

 

10. Officer
Clements then placed the Defendant under arrest for Driving While Intoxicated.

 

11. Officer
Clements’s testimony before this Court is credible in all respects.

The trial court made the following
conclusions of law:

1.    
The initial exchange between
Lewisville Police Officer Christopher Clements and the Defendant constituted a
voluntary encounter and not a detention.

 

2.    
Upon noticing signs of
intoxication and identifying the Defendant as the driver, Officer Clements had
reasonable suspicion under the totality of the circumstances to detain the
Defendant was [sic] driving while intoxicated.

 

3.    
Officer Clements then began a
lawful investigative detention for driving while intoxicated.

 

4.    
The investigation was reasonably
related in scope to a driving while intoxicated investigation and was necessary
to effectuate law enforcement purposes.

 

5.    
The evidence gathered by Officer
Clements was a result of non-custodial questioning during the course of an
investigative detention.

 

6.    
The investigative detention was
reasonable and was not a custodial interrogation.

 

7.    
The detention of the Defendant was
lawful.

After the trial court denied her
motion to suppress, Howard pleaded nolo contendere in exchange for a $500 fine,
twenty months of community supervision, and a 170-day sentence (suspended).  This
appeal followed.

III.  Suppression

          In her single issue, Howard
argues that the trial court erred by denying her motion to suppress.

A.  Standard of Review

          We review a trial court’s
ruling on a motion to suppress evidence under a bifurcated standard.  Amador
v. State, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); Guzman v. State,
955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  The trial judge is the sole trier of
fact and judge of the credibility of the witnesses and the weight to be given
their testimony.  Wiede v. State, 214 S.W.3d 17, 24–25 (Tex. Crim. App.
2007); State v. Ross, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), modified
on other grounds by State v. Cullen, 195 S.W.3d 696 (Tex. Crim. App.
2006).  Therefore, we give almost total deference to the trial court’s rulings
on (1) questions of historical fact, even if the trial court’s
determination of those facts was not based on an evaluation of credibility and
demeanor, and (2) application-of-law-to-fact questions that turn on an
evaluation of credibility and demeanor.  Amador, 221 S.W.3d at 673; Montanez
v. State, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); Johnson v.
State, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).  But when
application-of-law-to-fact questions do not turn on the witnesses’ credibility
and demeanor, we review the trial court’s rulings on those questions
de novo.  Amador, 221 S.W.3d at 673; Estrada v. State, 154
S.W.3d 604, 607 (Tex. Crim. App. 2005); Johnson, 68 S.W.3d at 652–53.

          Stated another way, when
reviewing the trial court’s ruling on a motion to suppress, we must view the
evidence in the light most favorable to the trial court’s ruling.  Wiede,
214 S.W.3d at 24; State v. Kelly, 204 S.W.3d 808, 818 (Tex. Crim. App.
2006).  When the trial court makes explicit fact findings, as here, we
determine whether the evidence, when viewed in the light most favorable to the
trial court’s ruling, supports those fact findings.  Kelly, 204 S.W.3d
at 818–19.  We then review the trial court’s legal ruling de novo unless
its explicit fact findings that are supported by the record are also
dispositive of the legal ruling.  Id. at 818.  We review a trial court’s
determination of historical facts that is based on a videotape under the
“almost total deference” standard.  Montanez v. State, 195 S.W.3d
101,109 (Tex. Crim. App. 2006).

B.  Miranda

In her single issue, Howard argues
that the trial court erred by denying her motion to suppress because Officer
Clements violated her right to remain silent and right to counsel when he
engaged in custodial interrogation without apprising her of her Miranda
rights.[2]
 Specifically, Howard complains that the trial court erred by denying her
motion because Officer Clements’s continued detention of her after completing
his conversation with the 911 caller was unlawful, as the detention, lasting “a
little over 30 minutes,”  “greatly exceeded the length necessary for the
investigation.”  Because she did not receive her Miranda warnings after
Officer Clements concluded his phone conversation with the 911 caller, Howard
claims that all evidence obtained after the phone call—when she argues that the
investigative detention turned into a custodial interrogation—should have been suppressed.

The State responds that Officer
Clements initially contacted Howard and Taylor as part of a consensual
encounter through which he obtained specific, articulable facts that Howard had
been engaged in criminal activity—the DWI—and detained her as part of a legal
investigatory detention, which lasted a reasonable amount of time to effectuate
the purpose of the stop.

          1.  Suppression Hearing

          Lewisville Police Officer
Christopher Clements was the only witness to testify at the suppression
hearing.

a.   
 Officer
Clements’s Testimony

Officer Clements testified that when he
arrived at a Tom Thumb parking lot at around 1:00 a.m. in response to a 911
call about a possible drunk driver who had struck a curb, he did not activate
his patrol vehicle’s lights but instead walked up to Howard and her companion, Taylor,
who was attempting to change a flat tire, and started talking with them.  Howard
was leaning against the truck, and Officer Clements noticed that her eyes were
glassy and heavy, that she had a strong odor of alcoholic beverage on her
breath, and—once he asked her to move away from the truck—she swayed and was
unsteady on her feet.

          When Officer Clements asked
Howard about how they came to be in the parking lot and changing the tire,
Howard told him that she and Taylor had gone to get cigarettes from the gas
station, that Taylor had driven them to the parking lot, and then Howard had
driven within the parking lot.  Officer Clements stated that Howard told him
more than once that she had been driving the truck in the parking lot.  After
Howard told him this, Officer Clements began asking her questions about where
she had been coming from, what she had been drinking, and how much she had had
to drink before he administered several field sobriety tests.  He determined
that Howard was the driver after conversing with Howard and Taylor, and based
on the results of Howard’s performance on the field sobriety tests,[3]
Officer Clements concluded that Howard was intoxicated and placed her under
arrest for DWI at around 1:30 a.m.

          Officer Clements testified
that his investigation took twenty to twenty-five minutes, and when asked if he
had spoken to the 911 caller, he replied, “I believe we tried to call him back
but we couldn’t get an answer on his phone.”  He restated during
cross-examination that he had not spoken with the eyewitness and that he did
not recall speaking with the eyewitness.  Officer Clements acknowledged that at
no point did he read to Howard her Miranda warnings, and he said that
Howard was not free to leave while he was conducting his DWI investigation
because once he had ascertained that she was the driver, she was being detained
until he finished his investigation.

          After the trial judge heard
Officer Clements’s testimony, he watched the DVD from Officer Clements’s patrol
vehicle’s dashboard camera.

b.   DVD

          The DVD recording begins
with Officer Clements’s patrol vehicle pulling into a strip mall parking lot
and stopping a few feet from a white or tan truck where a man wearing jeans and
an orange shirt, Taylor, is talking with a woman, Howard; both are standing outside
on the passenger side of the truck.  As Officer Clements approaches the truck,
the man turns to open the rear passenger door and reaches inside.  As Officer
Clements says, “Hello,” to the couple, his backup arrives.

In response to Officer Clements’s
greeting, Taylor tells him that their tire is flat, and Officer Clements says,
“Okay, what’s going on?”  Taylor tells him that he is trying to change the tire
and is having some trouble.  When Officer Clements asks how the tire went flat,
Taylor responds, “She hit the curb . . . just pulling around the corner a
little bit.”  Taylor complains that he cannot get his jack to work properly and
that they had tried to call his brother, who lived nearby, to come help them.

Officer Clements then asks them what
they were doing that evening.  Taylor tells him that they were trying to get
back to his brother’s house because they have a softball tournament to attend
in the morning.  Howard interrupts and tells Officer Clements that they are
from Oklahoma, that this is the first night that they have been in Texas, and
that they went to a Rangers game and now they are fixing a tire and it is no
fun.  When Officer Clements asks her about the Rangers game, Howard complains
that they had to leave early.  Taylor continues to rummage inside the vehicle
as the two officers look on, having explained that they cannot help with his truck.
 The other officer goes around to look at the damage to the tire and then
returns, telling Howard that the tire’s rim is bent.

Officer Clements steps away to speak
to dispatch, asking “Where’s our caller at?”  He then initiates a call with
Jeff Cott, the 911 caller, which lasts around four minutes.  The DVD contains
only Officer Clements’s side of the conversation.  Officer Clements asks Cott,
“Did you actually see what happened?”  After listening to Cott for a few
minutes, Officer Clements asks, “So were there three of them or just two of
them?”  Half a minute later, he asks, “You didn’t happen to see who was driving
or anything like that?”  After a few seconds more, Officer Clements thanks Cott
for making his call and, in response to something Cott says, responds, “Well,
one of them may be, I’m not real sure yet.  I’ve talked to her but that’s why
we’re trying to figure out if you knew who was driving so, yeah.”  After a
moment, he continues, “That’s what it looks like to me; that’s what she said
happened, so.”

Upon concluding his conversation with
Cott, Officer Clements asks the other officer whether Howard had said anything
to him.  They agree that Howard appears intoxicated but also agree that they are
still not sure whether she was the driver.

The officers return to the truck, and
Officer Clements asks Howard for her name and asks her to step away from the
truck.  He asks, “Tell me what happened this evening because we had someone
call about this truck driving crazy through the parking lot here at Tom Thumb”
with squealing tires “and everything.”  Howard says, “We don’t even know how to
squeal tires.”  Howard then says, “Actually, I’ve had like two drinks and
nothing to eat, to be honest with you.”  Gesturing, she states, “But we turned
in there, we came around here, and turned in here and stopped.”  Officer
Clements asks her where they had been trying to go, and Howard then explains
that Taylor’s brother lives half a mile from the shopping center.  When Officer
Clements asks Howard which curb they had hit, she replies, “I didn’t even think
we hit a curb.”  Officer Clements reminds Howard that they had to have hit
something because the tire’s rim is bent.  Howard asks, “His rim is bent?”

Officer Clements asks Howard if it
was just her and Taylor in the truck that evening, and she replies, “Yeah.”  He
then asks her, “Who was driving?”  Howard responds, “Him and I.”  When Officer
Clements asks her again who was driving the truck, she replies, “I drove the
first part; he drove the second part.”  Officer Clements then asks who was
driving when they got to the parking lot.  Howard replies, “I was.”  Officer
Clements then asks again, “You were driving when you got to the parking lot?” 
Howard agrees that she was.  Officer Clements then asks Howard where they were
coming from, and Howard tells him that they were coming from Taylor’s brother’s
house and were trying to go to the gas station for cigarettes.

At that point, the other officer
interrupts to speak with Officer Clements, and Officer Clements asks Howard to
stay where she is while they move away to converse.  The other officer tells
Officer Clements that he has learned from Taylor that while Taylor does not
know what Howard hit, the couple had been in an argument and that when they
exited the vehicle to argue, Howard then jumped into the driver’s side and took
off.

Officer Clements returns to speak
with Howard and asks her for her driver’s license.  Howard returns to the truck
to retrieve her license.  After Officer Clements checks her license, he asks
Howard to move back over to where they had been talking—between the police
vehicle and the truck.  He asks her where they had been drinking that night,
and Howard explains that she did not know because she was from out of town.  When
Officer Clements asks about when she went to the Rangers game, Howard informs
him that she and Taylor had not gone to the Rangers game and that it was Taylor’s
twin brother and the brother’s wife that had gone to the game.

Officer Clements then asks Howard how
much she has had to drink.  Howard replies that she had two rum and diet cokes
forty-five minutes to an hour and a half ago.  He asks her what else she has
had, and Howard tells him that she also took two Tylenol PM pills.  He asks her
a few more questions about whether she has any medical conditions or injuries.

Officer Clements then repeats what Howard
said back to her, adding the part he had learned from the other officer about
the argument and her jumping into the vehicle and taking off.  Howard replies,
“I was driving.  I was okay to drive at the time.”  After additional
conversation, which takes their interaction after the phone conversation with
Cott to around six minutes, Officer Clements begins administering several
sobriety tests to Howard, the directions of which Howard has a noticeably
difficult time understanding and complying with, culminating in her arrest for
DWI.

          2.  Applicable Law

The need for Miranda warnings
arises when questioning is initiated by law enforcement officers after a person
has been taken into custody or otherwise deprived of her freedom of action in
any significant way.  Campbell v. State, 325 S.W.3d 223, 233 (Tex.
App.—Fort Worth 2010, no pet.) (citing Miranda, 384 U.S. at 444, 86 S.
Ct. at 1612).  Therefore, we must determine whether the trial court’s explicit
fact findings are supported by the record and whether it erred by concluding
that Howard was not in custody or otherwise restrained to the degree associated
with an arrest as opposed to an investigative detention after Officer Clements
concluded his phone call with the 911 caller.  See id. at 233, 236.

          The facts of this case are
not those of a traditional traffic stop.  Cf. id. at 235 (noting that
appellant’s vehicle was parked when the officer arrived to investigate a
potential DWI).  In Campbell, another nontraditional traffic stop, we observed
that custody may include (1) when the suspect is physically deprived of her
freedom of action in any significant way; (2) when the officer tells the
suspect she cannot leave; (3) when the officer creates a situation that would
lead a reasonable person to believe that her freedom of movement has been
significantly restricted; and (4) when there is probable cause to arrest, the officer
does not tell the suspect she is free to leave, and the officer manifests his knowledge
of probable cause to the suspect.  Id. at 233 (citing Dowthitt v.
State, 931 S.W.2d 244, 252–55 (Tex. Crim. App. 1996)).  The nature of the offense
under investigation, the degree of suspicion, the stop’s location, the time of
day, and the suspect’s reaction also bear on whether a particular seizure is an
arrest or an investigative detention.  Id. at 234.  The officer’s
opinion, though not determinative, is another factor, as well as whether the
officer actually conducts an investigation after seizing the suspect, such as
asking questions about identity, the reason for being in the area, or “similar
reasonable inquiries of a truly investigatory nature.”  Id.  Whether a
seizure is an arrest or an investigative detention depends on the intrusion’s
reasonableness under all of the facts.  Id.

          The trial court concluded,
and its findings and the record reflect, that nothing—other than Officer
Clements’s subjective opinion that Howard was not free to leave once he began
conducting his DWI investigation—indicated that Officer Clements had deprived Howard
of her liberty to the extent of an arrest until he handcuffed her upon
concluding the field sobriety tests.  Cf. id. at 235–36 (holding that the
acts of taking away appellant’s keys and of asking questions prior to
handcuffing were part of continuing investigatory detention).  Prior to handcuffing
her after the field sobriety tests, Officer Clements did not tell Howard that
she could not leave or create a situation in which a reasonable person would
believe that her freedom of movement had been significantly restricted.  Further,
the nature of the offense and degree of suspicion, despite Taylor’s admission during
the initial encounter that Howard had hit a curb, supported that Officer
Clements’s questions to Howard after speaking with Cott remained part of his investigation
rather than a custodial interrogation.  And the flat tire would have detained
Howard in the parking lot after 1:00 a.m. regardless of Officer Clements’s
investigation.

          Although Howard argues that
the duration of the stop—thirty minutes—converted the investigatory detention
into custody, the general rule in determining whether the scope of an
investigative detention is “reasonable” is that it “can last no longer than
necessary to effect the purpose of the stop.”  Kothe v. State, 152
S.W.3d 54, 63 (Tex. Crim. App. 2004) (stating that if a driver is stopped on
suspicion of DWI, once the officer determines that the driver is not impaired,
he should be promptly released).  Although a detention’s length may render a
stop unreasonable, there is no rigid, bright-line time limit.  Belcher v.
State, 244 S.W.3d 531, 539 (Tex. App.—Fort Worth 2007, no pet.) (citing United
States v. Sharpe, 470 U.S. 675, 679, 105 S. Ct. 1568, 1571 (1985)).  Rather,
the issue is “‘whether the police diligently pursued a means of investigation
that was likely to confirm or dispel their suspicions quickly, during which
time it was necessary to detain the defendant.’”  Kothe, 152 S.W.3d at
64–65 (quoting Sharpe, 470 U.S. at 685–86, 105 S. Ct. at 1575).

Here, Officer Clements called Cott, the
911 caller, before returning to speak with Howard.  Therefore, we must evaluate
whether this four-minute phone call, followed by his six-minute interaction
with Howard prior to administering field sobriety tests, was reasonable under
the circumstances.  Cf. Belcher, 244 S.W.3d at 541–42 (holding that the
twenty-seven minute delay while original investigating officer waited on
another officer to finish the DWI investigation was reasonable under the
circumstances presented by the record).

          Officer Clements made only
a few comments during the four-minute call—the DVD recording reflects that most
of the conversation with Cott involved Officer Clements listening to what Cott
had to say.  During his subsequent interaction with Howard, Officer Clements
asked questions pertaining to what Cott had apparently described and about where
Howard and Taylor had been going.  He also asked for her driver’s license and asked
if she had any medical conditions or injuries.[4]
 All of this questioning took around twelve minutes before Officer Clements
began administering the field sobriety tests.  Viewing all of the evidence in
the light most favorable to the trial court’s ruling, and giving almost total
deference to its historical fact findings supported by the record, we conclude
as a matter of law that, under the totality of the circumstances—particularly
the relatively short time periods at issue and the flat tire that would have
detained Howard in the parking lot regardless of the investigation—the
continued investigatory detention was reasonable.  See, e.g., Balentine v.
State, 71 S.W.3d 763, 771 (Tex. Crim. App. 2002) (stating that investigative
detention of thirty to sixty minutes was reasonable for questioning and noting
that the amount of time needed “increased substantially because of appellant’s
evasive answers”); Bullock v. State, No. 01-11-00347-CR, 2012 WL
5877425, at *5 (Tex. App.—Houston [1st Dist.] Nov. 21, 2012, no pet.)
(concluding that thirty-five minutes was not an unreasonable amount of time to
spend on questioning appellant and administering six field sobriety tests).
Therefore, we overrule Howard’s sole issue.

IV.  Conclusion

          Having overruled Howard’s
sole issue, we affirm the trial court’s judgment.

 

                                                          BOB
MCCOY

                                                                             JUSTICE

 

PANEL:  MCCOY, MEIER, and
GABRIEL, JJ.

 

GABRIEL, J., concurs without
opinion.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  March 14, 2013









[1]See
Tex. R. App. P. 47.4.





[2]See
Miranda v. Arizona, 348 U.S. 436, 86 S. Ct. 1602 (1966).





[3]Officer
Clements testified that Howard’s score of four out of six clues on the
horizontal gaze nystagmus test indicated intoxication and that her performances
on the walk-and-turn and one-legged-stand tests resulted, respectively, in
eight of eight possible clues and four of four possible clues.  She also
performed “poorly” on the alphabet and counting tests.





[4]During
a traffic stop, an officer may ask about the destination and purpose of the
trip and request identification.  Caraway v. State, 255 S.W.3d 302,
307–08 (Tex. App.—Eastland 2008, no pet.).  Questions about medical conditions
or injuries are incident to administering field sobriety tests and do not
constitute interrogation.  See Warren v. State, 377 S.W.3d 9, 17–18
(Tex. App.—Houston [1st Dist.] 2011, pet. ref’d) (“In order to assess a field
sobriety test’s efficacy in determining intoxication, it is beneficial for the
officer to know if there are factors other than intoxication that would inhibit
the suspect’s ability to perform the required tasks.”).