

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00187-CR

| | | |
|---|---|---|
| Melinda R. Howard | § | From County Criminal Court No. 2 |
| | § | of Denton County (CR-2011-07177-B) |
| v. | § | March 14, 2013 |
| | § | Opinion by Justice McCoy |
| The State of Texas | § | (nfp) |

## JUDGMENT

This court has considered the record on appeal in this case and holds that there was no error in the trial court's judgment. It is ordered that the judgment of the trial court is affirmed.

SECOND DISTRICT COURT OF APPEALS

By_____
Justice Bob McCoy



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00187-CR

MELINDA R. HOWARD                                                    APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

------------

FROM COUNTY CRIMINAL COURT NO. 2 OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

In one issue, Appellant Melinda R. Howard appeals the denial of her motion to suppress and subsequent conviction of driving while intoxicated (DWI). We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. Procedural Background

After her arrest for DWI, Howard filed a motion to suppress, which the trial court denied after a hearing, entering the following fact findings:

1. Lewisville Police Officer Christopher Clements was on patrol in the City of Lewisville, Denton County, Texas, sometime before 1:00 a.m. on July 2, 2011. Officer Clements is a certified peace officer. Officer Clements is certified to administer the Standardized Field Sobriety Tests, including the Horizontal Gaze Nystagmus test.

2. Officer Clements was dispatched to 1071 W[.] Round Grove Road, a public place, located in Lewisville, Denton County, Texas around 12:54 a.m. in reference to a possible intoxicated driver.

3. Civilian 911 caller Jeff Cott reported that he had observed a vehicle driving through the parking lot and strik[ing] a curb. Officer Clements observed a silver or tan pickup truck in the parking lot . . . matching the description of the vehicle that the 911 caller described. The vehicle had a flat tire. The pickup truck is a motor vehicle.

4. Officer Clements approached the truck, without the use of any lights or sirens from his patrol vehicle. Officer Clements made no show of authority as he approached the subjects.

5. When Officer Clements arrived, he observed two people, a male and a female. The male, later identified as passenger William Taylor, was attempting to change the vehicle's tire. Officer Clements approached the male and asked him what happened. Mr. Taylor told Officer Clements that "she hit a curb." Officer Clements had the female, later identified as Melinda Howard, step away from the vehicle.

6. While speaking with Ms. Howard, the defendant, Officer Clements noticed an odor of alcoholic beverage coming from the defendant's breath and that her speech was slurred and thick-tongued.

7. Ms. Howard admitted to Officer Clements that she had been driving through the parking lot and that she had been drinking

3

alcohol that evening. She also told Officer Clements that she had taken two (2) Tylenol PM pills 45 minutes prior.

8. Officer Clements believed at that time that, under the totality of the circumstances observed, that the defendant may have been driving while intoxicated and preceded to further investigate Ms. Howard for the offense of Driving While Intoxicated.

9. Officer Clements asked the Defendant to perform the Standardized Field Sobriety Tests as well as two non-standardized field sobriety tests.

10. Officer Clements then placed the Defendant under arrest for Driving While Intoxicated.

11. Officer Clements's testimony before this Court is credible in all respects.

The trial court made the following conclusions of law:

1. The initial exchange between Lewisville Police Officer Christopher Clements and the Defendant constituted a voluntary encounter and not a detention.

2. Upon noticing signs of intoxication and identifying the Defendant as the driver, Officer Clements had reasonable suspicion under the totality of the circumstances to detain the Defendant was [sic] driving while intoxicated.

3. Officer Clements then began a lawful investigative detention for driving while intoxicated.

4. The investigation was reasonably related in scope to a driving while intoxicated investigation and was necessary to effectuate law enforcement purposes.

5. The evidence gathered by Officer Clements was a result of non-custodial questioning during the course of an investigative detention.

6. The investigative detention was reasonable and was not a custodial interrogation.

4

7. The detention of the Defendant was lawful.

After the trial court denied her motion to suppress, Howard pleaded nolo contendere in exchange for a $500 fine, twenty months of community supervision, and a 170-day sentence (suspended). This appeal followed.

### III. Suppression

In her single issue, Howard argues that the trial court erred by denying her motion to suppress.

### A. Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the

5

witnesses' credibility and demeanor, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, as here, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *Kelly*, 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818. We review a trial court's determination of historical facts that is based on a videotape under the "almost total deference" standard. *Montanez v. State*, 195 S.W.3d 101,109 (Tex. Crim. App. 2006).

## B. *Miranda*

In her single issue, Howard argues that the trial court erred by denying her motion to suppress because Officer Clements violated her right to remain silent and right to counsel when he engaged in custodial interrogation without apprising her of her *Miranda* rights.[2] Specifically, Howard complains that the trial court erred by denying her motion because Officer Clements's continued detention of

---

[2]*See Miranda v. Arizona*, 348 U.S. 436, 86 S. Ct. 1602 (1966).

6

her after completing his conversation with the 911 caller was unlawful, as the detention, lasting "a little over 30 minutes," "greatly exceeded the length necessary for the investigation." Because she did not receive her *Miranda* warnings after Officer Clements concluded his phone conversation with the 911 caller, Howard claims that all evidence obtained after the phone call—when she argues that the investigative detention turned into a custodial interrogation—should have been suppressed.

The State responds that Officer Clements initially contacted Howard and Taylor as part of a consensual encounter through which he obtained specific, articulable facts that Howard had been engaged in criminal activity—the DWI—and detained her as part of a legal investigatory detention, which lasted a reasonable amount of time to effectuate the purpose of the stop.

### 1. Suppression Hearing

Lewisville Police Officer Christopher Clements was the only witness to testify at the suppression hearing.

#### a. Officer Clements's Testimony

Officer Clements testified that when he arrived at a Tom Thumb parking lot at around 1:00 a.m. in response to a 911 call about a possible drunk driver who had struck a curb, he did not activate his patrol vehicle's lights but instead walked up to Howard and her companion, Taylor, who was attempting to change a flat tire, and started talking with them. Howard was leaning against the truck, and Officer Clements noticed that her eyes were glassy and heavy, that she had a

7

strong odor of alcoholic beverage on her breath, and—once he asked her to move away from the truck—she swayed and was unsteady on her feet.

When Officer Clements asked Howard about how they came to be in the parking lot and changing the tire, Howard told him that she and Taylor had gone to get cigarettes from the gas station, that Taylor had driven them to the parking lot, and then Howard had driven within the parking lot. Officer Clements stated that Howard told him more than once that she had been driving the truck in the parking lot. After Howard told him this, Officer Clements began asking her questions about where she had been coming from, what she had been drinking, and how much she had had to drink before he administered several field sobriety tests. He determined that Howard was the driver after conversing with Howard and Taylor, and based on the results of Howard's performance on the field sobriety tests,[3] Officer Clements concluded that Howard was intoxicated and placed her under arrest for DWI at around 1:30 a.m.

Officer Clements testified that his investigation took twenty to twenty-five minutes, and when asked if he had spoken to the 911 caller, he replied, "I believe we tried to call him back but we couldn't get an answer on his phone." He restated during cross-examination that he had not spoken with the eyewitness

---

[3]Officer Clements testified that Howard's score of four out of six clues on the horizontal gaze nystagmus test indicated intoxication and that her performances on the walk-and-turn and one-legged-stand tests resulted, respectively, in eight of eight possible clues and four of four possible clues. She also performed "poorly" on the alphabet and counting tests.

8

and that he did not recall speaking with the eyewitness. Officer Clements acknowledged that at no point did he read to Howard her *Miranda* warnings, and he said that Howard was not free to leave while he was conducting his DWI investigation because once he had ascertained that she was the driver, she was being detained until he finished his investigation.

After the trial judge heard Officer Clements's testimony, he watched the DVD from Officer Clements's patrol vehicle's dashboard camera.

### b. DVD

The DVD recording begins with Officer Clements's patrol vehicle pulling into a strip mall parking lot and stopping a few feet from a white or tan truck where a man wearing jeans and an orange shirt, Taylor, is talking with a woman, Howard; both are standing outside on the passenger side of the truck. As Officer Clements approaches the truck, the man turns to open the rear passenger door and reaches inside. As Officer Clements says, "Hello," to the couple, his backup arrives.

In response to Officer Clements's greeting, Taylor tells him that their tire is flat, and Officer Clements says, "Okay, what's going on?" Taylor tells him that he is trying to change the tire and is having some trouble. When Officer Clements asks how the tire went flat, Taylor responds, "She hit the curb . . . just pulling around the corner a little bit." Taylor complains that he cannot get his jack to work properly and that they had tried to call his brother, who lived nearby, to come help them.

9

Officer Clements then asks them what they were doing that evening. Taylor tells him that they were trying to get back to his brother's house because they have a softball tournament to attend in the morning. Howard interrupts and tells Officer Clements that they are from Oklahoma, that this is the first night that they have been in Texas, and that they went to a Rangers game and now they are fixing a tire and it is no fun. When Officer Clements asks her about the Rangers game, Howard complains that they had to leave early. Taylor continues to rummage inside the vehicle as the two officers look on, having explained that they cannot help with his truck. The other officer goes around to look at the damage to the tire and then returns, telling Howard that the tire's rim is bent.

Officer Clements steps away to speak to dispatch, asking "Where's our caller at?" He then initiates a call with Jeff Cott, the 911 caller, which lasts around four minutes. The DVD contains only Officer Clements's side of the conversation. Officer Clements asks Cott, "Did you actually see what happened?" After listening to Cott for a few minutes, Officer Clements asks, "So were there three of them or just two of them?" Half a minute later, he asks, "You didn't happen to see who was driving or anything like that?" After a few seconds more, Officer Clements thanks Cott for making his call and, in response to something Cott says, responds, "Well, one of them may be, I'm not real sure yet. I've talked to her but that's why we're trying to figure out if you knew who was driving so, yeah." After a moment, he continues, "That's what it looks like to me; that's what she said happened, so."

10

Upon concluding his conversation with Cott, Officer Clements asks the other officer whether Howard had said anything to him. They agree that Howard appears intoxicated but also agree that they are still not sure whether she was the driver.

The officers return to the truck, and Officer Clements asks Howard for her name and asks her to step away from the truck. He asks, "Tell me what happened this evening because we had someone call about this truck driving crazy through the parking lot here at Tom Thumb" with squealing tires "and everything." Howard says, "We don't even know how to squeal tires." Howard then says, "Actually, I've had like two drinks and nothing to eat, to be honest with you." Gesturing, she states, "But we turned in there, we came around here, and turned in here and stopped." Officer Clements asks her where they had been trying to go, and Howard then explains that Taylor's brother lives half a mile from the shopping center. When Officer Clements asks Howard which curb they had hit, she replies, "I didn't even think we hit a curb." Officer Clements reminds Howard that they had to have hit something because the tire's rim is bent. Howard asks, "His rim is bent?"

Officer Clements asks Howard if it was just her and Taylor in the truck that evening, and she replies, "Yeah." He then asks her, "Who was driving?" Howard responds, "Him and I." When Officer Clements asks her again who was driving the truck, she replies, "I drove the first part; he drove the second part." Officer Clements then asks who was driving when they got to the parking lot. Howard

11

replies, "I was." Officer Clements then asks again, "You were driving when you got to the parking lot?" Howard agrees that she was. Officer Clements then asks Howard where they were coming from, and Howard tells him that they were coming from Taylor's brother's house and were trying to go to the gas station for cigarettes.

At that point, the other officer interrupts to speak with Officer Clements, and Officer Clements asks Howard to stay where she is while they move away to converse. The other officer tells Officer Clements that he has learned from Taylor that while Taylor does not know what Howard hit, the couple had been in an argument and that when they exited the vehicle to argue, Howard then jumped into the driver's side and took off.

Officer Clements returns to speak with Howard and asks her for her driver's license. Howard returns to the truck to retrieve her license. After Officer Clements checks her license, he asks Howard to move back over to where they had been talking—between the police vehicle and the truck. He asks her where they had been drinking that night, and Howard explains that she did not know because she was from out of town. When Officer Clements asks about when she went to the Rangers game, Howard informs him that she and Taylor had not gone to the Rangers game and that it was Taylor's twin brother and the brother's wife that had gone to the game.

Officer Clements then asks Howard how much she has had to drink. Howard replies that she had two rum and diet cokes forty-five minutes to an hour

12

and a half ago. He asks her what else she has had, and Howard tells him that she also took two Tylenol PM pills. He asks her a few more questions about whether she has any medical conditions or injuries.

Officer Clements then repeats what Howard said back to her, adding the part he had learned from the other officer about the argument and her jumping into the vehicle and taking off. Howard replies, "I was driving. I was okay to drive at the time." After additional conversation, which takes their interaction after the phone conversation with Cott to around six minutes, Officer Clements begins administering several sobriety tests to Howard, the directions of which Howard has a noticeably difficult time understanding and complying with, culminating in her arrest for DWI.

### 2. Applicable Law

The need for *Miranda* warnings arises when questioning is initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of her freedom of action in any significant way. *Campbell v. State*, 325 S.W.3d 223, 233 (Tex. App.—Fort Worth 2010, no pet.) (citing *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612). Therefore, we must determine whether the trial court's explicit fact findings are supported by the record and whether it erred by concluding that Howard was not in custody or otherwise restrained to the degree associated with an arrest as opposed to an investigative detention after Officer Clements concluded his phone call with the 911 caller. *See id.* at 233, 236.

13

The facts of this case are not those of a traditional traffic stop. *Cf. id*. at 235 (noting that appellant's vehicle was parked when the officer arrived to investigate a potential DWI). In *Campbell*, another nontraditional traffic stop, we observed that custody may include (1) when the suspect is physically deprived of her freedom of action in any significant way; (2) when the officer tells the suspect she cannot leave; (3) when the officer creates a situation that would lead a reasonable person to believe that her freedom of movement has been significantly restricted; and (4) when there is probable cause to arrest, the officer does not tell the suspect she is free to leave, and the officer manifests his knowledge of probable cause to the suspect. *Id*. at 233 (citing *Dowthitt v. State*, 931 S.W.2d 244, 252–55 (Tex. Crim. App. 1996)). The nature of the offense under investigation, the degree of suspicion, the stop's location, the time of day, and the suspect's reaction also bear on whether a particular seizure is an arrest or an investigative detention. *Id*. at 234. The officer's opinion, though not determinative, is another factor, as well as whether the officer actually conducts an investigation after seizing the suspect, such as asking questions about identity, the reason for being in the area, or "similar reasonable inquiries of a truly investigatory nature." *Id*. Whether a seizure is an arrest or an investigative detention depends on the intrusion's reasonableness under all of the facts. *Id.*

The trial court concluded, and its findings and the record reflect, that nothing—other than Officer Clements's subjective opinion that Howard was not free to leave once he began conducting his DWI investigation—indicated that

14

Officer Clements had deprived Howard of her liberty to the extent of an arrest until he handcuffed her upon concluding the field sobriety tests. *Cf. id.* at 235–36 (holding that the acts of taking away appellant's keys and of asking questions prior to handcuffing were part of continuing investigatory detention). Prior to handcuffing her after the field sobriety tests, Officer Clements did not tell Howard that she could not leave or create a situation in which a reasonable person would believe that her freedom of movement had been significantly restricted. Further, the nature of the offense and degree of suspicion, despite Taylor's admission during the initial encounter that Howard had hit a curb, supported that Officer Clements's questions to Howard after speaking with Cott remained part of his investigation rather than a custodial interrogation. And the flat tire would have detained Howard in the parking lot after 1:00 a.m. regardless of Officer Clements's investigation.

Although Howard argues that the duration of the stop—thirty minutes—converted the investigatory detention into custody, the general rule in determining whether the scope of an investigative detention is "reasonable" is that it "can last no longer than necessary to effect the purpose of the stop." *Kothe v. State*, 152 S.W.3d 54, 63 (Tex. Crim. App. 2004) (stating that if a driver is stopped on suspicion of DWI, once the officer determines that the driver is not impaired, he should be promptly released). Although a detention's length may render a stop unreasonable, there is no rigid, bright-line time limit. *Belcher v. State*, 244 S.W.3d 531, 539 (Tex. App.—Fort Worth 2007, no pet.) (citing *United*

15

*States v. Sharpe*, 470 U.S. 675, 679, 105 S. Ct. 1568, 1571 (1985)).  Rather, the issue is "'whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'"  *Kothe*, 152 S.W.3d at 64–65 (quoting *Sharpe*, 470 U.S. at 685–86, 105 S. Ct. at 1575).

Here, Officer Clements called Cott, the 911 caller, before returning to speak with Howard.  Therefore, we must evaluate whether this four-minute phone call, followed by his six-minute interaction with Howard prior to administering field sobriety tests, was reasonable under the circumstances.  *Cf. Belcher*, 244 S.W.3d at 541–42 (holding that the twenty-seven minute delay while original investigating officer waited on another officer to finish the DWI investigation was reasonable under the circumstances presented by the record).

Officer Clements made only a few comments during the four-minute call— the DVD recording reflects that most of the conversation with Cott involved Officer Clements listening to what Cott had to say.  During his subsequent interaction with Howard, Officer Clements asked questions pertaining to what Cott had apparently described and about where Howard and Taylor had been going.  He also asked for her driver's license and asked if she had any medical conditions or injuries.[4]  All of this questioning took around twelve minutes before

---

[4]During a traffic stop, an officer may ask about the destination and purpose of the trip and request identification.  *Caraway v. State*, 255 S.W.3d 302, 307–08 (Tex. App.—Eastland 2008, no pet.).  Questions about medical conditions or injuries are incident to administering field sobriety tests and do not constitute

16

Officer Clements began administering the field sobriety tests. Viewing all of the evidence in the light most favorable to the trial court's ruling, and giving almost total deference to its historical fact findings supported by the record, we conclude as a matter of law that, under the totality of the circumstances—particularly the relatively short time periods at issue and the flat tire that would have detained Howard in the parking lot regardless of the investigation—the continued investigatory detention was reasonable. *See, e.g., Balentine v. State*, 71 S.W.3d 763, 771 (Tex. Crim. App. 2002) (stating that investigative detention of thirty to sixty minutes was reasonable for questioning and noting that the amount of time needed "increased substantially because of *appellant's* evasive answers"); *Bullock v. State*, No. 01-11-00347-CR, 2012 WL 5877425, at *5 (Tex. App.— Houston [1st Dist.] Nov. 21, 2012, no pet.) (concluding that thirty-five minutes was not an unreasonable amount of time to spend on questioning appellant and administering six field sobriety tests). Therefore, we overrule Howard's sole issue.

---

interrogation. *See Warren v. State*, 377 S.W.3d 9, 17–18 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) ("In order to assess a field sobriety test's efficacy in determining intoxication, it is beneficial for the officer to know if there are factors other than intoxication that would inhibit the suspect's ability to perform the required tasks.").

## IV.  Conclusion

Having overruled Howard's sole issue, we affirm the trial court's judgment.

BOB MCCOY
JUSTICE

PANEL:  MCCOY, MEIER, and GABRIEL, JJ.

GABRIEL, J., concurs without opinion.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  March 14, 2013