**Opinion issued August 26, 2014**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-13-00259-CR

————————————

**ALYSSA PULLEN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the County Criminal Court at Law No. 4**
**Harris County, Texas**
**Trial Court Case No. 1817849**

---

## MEMORANDUM OPINION

A jury found appellant, Alyssa Pullen, guilty of the misdemeanor offense of

driving while intoxicated ("DWI"),[1] and the trial court assessed her punishment at

confinement for three days and a fine of $1,500. In two issues, appellant contends

---

[1] *See* TEX. PENAL CODE ANN. § 49.04(a) (Vernon Supp. 2013).

that the trial court erred in denying her motion to suppress all "evidence obtained as a result of [an] unreasonable detention" and, alternatively, her blood specimen, which was obtained pursuant to a search warrant "based upon material misrepresentations and omissions."[2]

We affirm.

## Background

Houston Police Department ("HPD") Officer M. Muskiet testified that at 2:55 a.m. on March 25, 2012, while on patrol duty with Officer Gautreaux, he stopped appellant. When he approached the driver's side of appellant's car to speak with her, he noticed that she had a "[s]trong odor of alcohol on her breath," spoke with slurred speech, and had "red eyes." After obtaining appellant's driver's license, Muskiet radioed a request for HPD Officer S. Sanchez, working as a designated DWI patrol unit, "to come out and take control of the situation." Appellant remained in her car, and although he did not ask her any further questions, Muskiet kept her driver's license and she was not free to leave. After twenty-four to thirty minutes, Sanchez arrived at the scene.

Officer S. Sanchez testified that on March 25, 2012, she, having been assigned to work as the designated DWI patrol unit, was dispatched to assist Officer Muskiet. She arrived at the scene at 2:49 a.m., twenty-four minutes after

---

[2]    *See* U.S. CONST. AMEND. IV.

Muskiet's traffic stop. When she spoke with appellant, Sanchez noted that appellant had "red eyes, slurred speech," and her breath smelled of alcohol. Sanchez asked appellant if she had been drinking, and appellant said that she had two drinks at 2:00 a.m. and had last eaten at 11:00 p.m. Sanchez then administered to appellant one field sobriety test, the horizontal gaze nystagmus ("HGN") test, and appellant exhibited six out of six "clues" indicating intoxication. At 2:57 a.m., Sanchez transported appellant to the HPD Central Intoxilyzer Facility ("Central Intox") in order to determine whether she was intoxicated. Once at Central Intox, Sanchez had HPD Officer McRae perform additional sobriety tests.

Officer McRae testified that on March 25, 2012, while working at Central Intox, he read appellant her statutory warnings from form DIC-24[3] and asked her to provide a specimen of her breath and blood, but she declined. After appellant declined to provide a breath or blood sample, the officers videotaped McRae administering the additional sobriety tests to appellant. The trial court admitted the videotape into evidence.

Officer McRae explained that Standard Field Sobriety Tests are designed by the National Highway Traffic Safety Administration ("NHTSA") to determine

---

[3] The DIC–24 is a standard form used to request breath or blood specimens from suspected intoxicated drivers. *See Martin v. Dep't of Pub. Safety*, 964 S.W.2d 772, 773 (Tex. App.—Austin 1998, no pet.). The form fulfills the statutory requirements of the Transportation Code. *See* TEX. TRANSP. CODE ANN. § 724.015 (Vernon Supp. 2013).

3

whether a person can perform two or more tasks simultaneously to see if the person is impaired.  Three of the tests validated by the NHTSA have their own "clues," or signs, to reveal intoxication: the HGN test, the walk-and-turn test, and the one-leg stand test.  Thus, a poor performance on only one of the tests can reveal intoxication.

Officer McRae first administered to appellant the one-leg stand test, and, while the videotape was being played for the jury, he noted that he saw one "clue" indicating intoxication.  Next, McRae administered the walk-and-turn test, and appellant demonstrated two "clues" for intoxication.  McRae then administered the Rhomberg test, in which appellant was asked to estimate time lapse while, with her eyes closed, tilting her head back for an estimated thirty seconds.  McRae noted that appellant began "swaying" after only five to six seconds and estimated that thirty seconds had lapsed after only eighteen seconds had actually passed.  This indicated that appellant had lost the normal use of her physical and mental faculties.  Finally, McRae administered the "alphabet test" to appellant, in which she was instructed to recite the letters of the alphabet beginning with the letter "K" and ending with the letter "X."  Appellant recited "L, M, N, O, P, Q, R, X" the first time McRae administered the test and "K, L, M, N, O, P, Q, R, X" the second time. McRae explained that considering all of the information obtained from appellant's performance of the Standard Field Sobriety Tests, as well as the Rhomberg and

4

alphabet tests, he formed the opinion that appellant did not have the normal use of her mental and physical faculties. And, in his opinion, based on Officer Sanchez's report and the strong odor of alcohol on appellant's breath, alcohol was the cause of her intoxication.

After having spoken to Officers Muskiet and Gautreaux, performed her own investigation at the scene, and observed Officer McRae administer the additional sobriety tests to appellant, Officer Sanchez testified that she obtained a search warrant for appellant's blood.

HPD Criminalist L. Mayor testified that the results of testing conducted on appellant's March 25, 2012 blood sample showed that she had 0.18 grams of alcohol per 100 milliliters of her blood. Mayor explained that, through using a "retrograde extrapolation" analysis,[4] she calculated that if appellant, at the time her blood sample was obtained, was in the "elimination phase," i.e., eliminating alcohol from her body, her estimated blood alcohol content would have been between 0.21 and 0.27 at the time of the traffic stop. Mayor also calculated that if

---

[4]     "Retrograde extrapolation" is a mathematical calculation used to estimate a blood alcohol concentration at a time prior to the obtaining of blood for testing, based in part on the average absorption rate of alcohol in the human body. Mayor explained that her calculation was based on the specific facts relevant to appellant's case: a female; weighing 115 pounds; five feet, three inches tall; twenty-one years old; who had consumed two alcoholic drinks, consisting of vodka and soda, at 2:00 a.m.; who last ate at 11:00 p.m.; who was detained at 2:25 a.m.; and whose blood was drawn at 5:32 a.m. and showed a blood alcohol concentration at that time of 0.18.

appellant, at the time her blood sample was obtained, was instead in the "absorption phase," i.e., absorbing alcohol into her blood, her blood alcohol content would have been between 0.19 and 0.21 at the time of the traffic stop. She opined, therefore, that the minimum blood alcohol level for appellant at the time Officer Muskiet conducted the traffic stop was 0.19.

## Standard of Review

We review a trial court's denial of a motion to suppress evidence under a bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We review the trial court's factual findings for an abuse of discretion and the trial court's application of the law to the facts de novo. *Id.* Almost total deference should be given to a trial court's implied findings, especially those based on an evaluation of witness credibility or demeanor. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). The trial court is the sole and exclusive trier of fact and judge of a witness's credibility, and it may choose to believe or disbelieve all or any part of the witness's testimony. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000). Therefore, we give almost total deference to the trial court's rulings on questions of historical fact and application-of-law-to-fact that turn on an evaluation of credibility and demeanor. *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644,

652–53 (Tex. Crim. App. 2002). When a trial court's rulings do not turn on the credibility and demeanor of the witnesses, we review de novo the trial court's rulings on mixed questions of law and fact. *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

When, as here, a trial court makes certain explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports its fact findings. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). We then review the trial court's legal ruling de novo, unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.*

### Investigative Detention

In her first issue, appellant argues that the trial court erred in denying her motion to suppress all evidence obtained as a result of Officer Muskiet's detention of her because he "unreasonably detained" her for at least twenty-four minutes before arresting her and the "delay did not further any legitimate law enforcement purposes." *See* U.S. CONST. amend. IV. She further argues that the twenty-four minute detention was "inherently unreasonable" because "Muskiet did not diligently pursue an investigation to confirm or dispel his suspicion that she was intoxicated," but instead waited for a "less experienced officer" to come to the scene. The State responds that the detention of appellant for a DWI investigation

7

was based on Muskiet's reasonable suspicion that she was intoxicated and it was not unreasonable for him to call in a designated DWI patrol unit to the scene, a decision he based on legitimate law enforcement purposes.

In its findings of fact and conclusions of law, the trial court specifically found that "during the 30 minute[s] it took [O]fficer Sanchez to arrive," appellant "was allowed to remain in her vehicle" and "was not handcuffed or otherwise restrained, but was not free to leave." It concluded that Officer Muskiet had probable cause to stop appellant and the "[thirty-]minute detention period was not unreasonable."

The question of whether a specific search or seizure is "reasonable" under the Fourth Amendment as applied to the historical facts found by a trial court is subject to de novo review. *Kothe v. State*, 152 S.W.3d 54, 62 (Tex. Crim. App. 2004). To decide whether appellant's detention while Officer Muskiet waited for Officer Sanchez was "reasonable" under the specific circumstances presented here, we view the trial court's factual findings in the light most favorable to its ruling, but we decide the issue of "reasonableness" as a question of Fourth Amendment law. *Id.* at 63; *Belcher v. State*, 244 S.W.3d 531, 538 (Tex. App.—Fort Worth 2007, no pet.).

An investigative detention by a law enforcement officer in which the subject of the investigation is not free to leave is a seizure for purposes of the Fourth

Amendment. *Johnson v. State*, 912 S.W.2d 227, 236 (Tex. Crim. App. 1995). "The Fourth Amendment prohibits unreasonable searches and seizures, and this limitation is implicated by a law enforcement officer's detention of motorists during a traffic stop." *Bullock v. State*, 426 S.W.3d 226, 229 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (citing *Arizona v. Johnson*, 555 U.S. 323, 326–27, 129 S. Ct. 781, 784 (2009); *Garcia v. State*, 827 S.W.2d 937, 943–44 (Tex. Crim. App. 1992)). "A law enforcement officer may lawfully stop and detain a motorist who commits a traffic violation." *Id.* (citing *Arizona*, 555 U.S. at 327, 129 S. Ct. at 784; *Garcia*, 827 S.W.2d at 944). Such a traffic stop generally constitutes a legitimate "investigative stop." *Id.* (citing *Arizona*, 555 U.S. at 327, 129 S. Ct. at 784); s*ee also Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968). However, "the length of [a] detention must be reasonable in relation to the officer's investigation; and at some point, a detention may become too long in duration to be justified as an investigative stop." *Bullock*, 426 S.W.3d at 229 (citing *United States v. Sharpe*, 470 U.S. 675, 683–88, 105 S. Ct. 1568, 1574–77 (1985)).

The United States Supreme Court has adopted a two-pronged inquiry for determining the reasonableness of an investigative detention: (1) "whether the officer's action was justified at its inception," and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19–20, 88 S. Ct. at 1879; *see also Davis v. State*, 947

9

S.W.2d 240, 242 (Tex. Crim. App. 1997) (holding *Terry* analysis applies in Texas). This is a factual determination, and it "is to be made and reviewed by considering the totality of the circumstances existing throughout the detention." *Belcher*, 244 S.W.3d at 538–39 (citing *Loesch v. State*, 958 S.W.2d 830, 832 (Tex. Crim. App. 1997)).

There is no bright line rule as to how long a traffic stop may continue and still be considered reasonable. *Bullock*, 462 S.W.3d at 229. "[C]ommon sense and ordinary human experience must govern over rigid criteria." *Belcher*, 244 S.W.3d at 539 (citing *Sharpe*, 470 U.S. at 685, 105 S. Ct. at 1575). The reasonableness of the duration of a detention depends on whether the law enforcement officer "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe*, 470 U.S. at 686, 105 S. Ct. at 1575. In determining the reasonableness of the duration of a detention, we may consider legitimate law enforcement purposes served by any delay in the officer's investigation. *Id.* at 685, 105 S. Ct. at 1575. Fourth Amendment reasonableness "requires a balance between the public interest served and the individual's right to be free from arbitrary detentions and intrusions." *Kothe*, 152 S.W.3d at 63.

A delay in an officer's investigation to confirm or dispel the officer's suspicions of the suspect, and a resulting prolonged detention, is reasonable under

10

the Fourth Amendment when the delay furthers legitimate law enforcement purposes. *See Sharpe*, 470 U.S. at 685, 105 S. Ct. 1575; *Hartman v. State*, 144 S.W.3d 568, 572–73 (Tex. App.—Austin 2004, no pet.). Texas courts have held that such legitimate law enforcement purposes include: a delay to permit the arrival of a DWI enforcement officer so that a supervising officer may return to duty; a delay for the arrival of a video camera so that the DWI investigation and field sobriety tests could be videotaped according to department procedure; and a delay for the arrival of a new officer in need of training. *Hartman*, 144 S.W.3d at 573–74 (holding five to fifteen-minute delay in DWI investigation for video recording reasonable); *Smith v. State*, No. 03-06-00085-CR, 2007 WL 700834, at *3–4 (Tex. App.—Austin Mar. 7, 2007, pet. ref'd) (mem. op., not designated for publication) (holding delay in DWI investigation for new officer training reasonable); *Dickson v. State*, No. 03-06-00126-CR, 2006 WL 3523789, at *1, 4 (Tex. App.—Austin Dec. 6, 2006, no pet.) (mem. op., not designated for publication) (holding twenty-minute delay in DWI investigation for arrival of DWI enforcement officer reasonable).

Appellant argues that the length of her detention was unreasonable because Officer Muskiet actually stopped his investigation and waited for Officer Sanchez, a "less experienced officer," to arrive at the scene. And she asserts that Muskiet did not "diligently pursue an investigation related to his suspicion that [she] was

11

intoxicated during the delay" and made no attempt to confirm his suspicion in the least intrusive manner possible.

Here, the trial court could have reasonably concluded that Officer Muskiet's detention of appellant, until Officer Sanchez arrived thirty minutes, as found by the trial court, after Muskiet initially stopped appellant, was reasonably related to his belief that she was intoxicated. Muskiet began an investigation when he stopped and questioned appellant after she had run a red light. He testified that while speaking with her, he noticed that she had a strong odor of alcohol on her breath, spoke with slurred speech, and had "red eyes." Muskiet explained that he had been an HPD officer for six years and had received DWI training, including training in the administration of sobriety tests. He noted that his experience patrolling for six years had "greatly improved" his ability "to detect whether someone is intoxicated" and, in regard to appellant, he had "determined that [there were] enough intoxication clues." Based on the evidence, he requested that Officer Sanchez "come out and take control of the situation."

Officer Muskiet explained that it would have taken him several hours to complete a DWI investigation of appellant and it was HPD's general procedure for patrol officers like him to call for a designated DWI patrol unit if available because it allowed them to "remain in service" and "run more calls instead of being tied up." Muskiet also explained that while a designated DWI officer is conducting her

investigation, it is the "usual practice" of patrol units to begin completing necessary paperwork, such as completing a "tow slip" if a defendant's automobile must be towed from the scene. Appellant's detention was based on HPD procedures developed for legitimate law enforcement purposes. *See Sharpe*, 470 U.S. at 685, 105 S. Ct. at 1575 (noting emphasis on "need to consider the law enforcement purposes served by stop as well as the time reasonably needed to effectuate such purposes").

Officer Muskiet's decision to detain appellant while waiting for Officer Sanchez was reasonably related to the underlying traffic stop and detention of appellant on suspicion of DWI and to further protect the public. Accordingly, we hold that legitimate law enforcement purposes were served by the detention of appellant so that Sanchez could arrive at the scene and complete the DWI investigation.

In regard to the length of appellant's detention, we examine whether, given the totality of the circumstances, the delay of the DWI investigation nonetheless rendered the detention unreasonable under the Fourth Amendment. Here, Officer Muskiet requested that Officer Sanchez continue the DWI investigation immediately after Muskiet noted certain "clues" that led him to suspect that appellant had been operating a motor vehicle while intoxicated. While waiting for Sanchez to arrive, appellant, although not free to leave, was not handcuffed and

was allowed to remain in her car. And, during the delay, she made at least one call on her cellular telephone. Most importantly, it took Sanchez only thirty minutes to arrive at the scene and continue the DWI investigation.

Although it is possible that Officer Muskiet could have administered the field sobriety tests himself, "the key inquiry is not whether a less intrusive alternative was available to [him], but whether [he] acted reasonably in failing to choose that alternative." *Hartman*, 144 S.W.3d at 574 (citing *Sharpe*, 470 U.S. at 687, 105 S. Ct. at 1576). Here, it was reasonable for Muskiet to call for Officer Sanchez, a designated DWI patrol officer, to continue the DWI investigation, even though doing so caused a delay in the investigation. Muskiet followed HPD procedure and promptly requested assistance from the designated DWI unit.

Balancing the public interest served against appellant's Fourth Amendment right to be free from arbitrary detention and intrusion, giving almost total deference to the trial court's historical fact findings, and viewing the evidence in the light most favorable to the trial court's ruling, we hold, given the totality of the circumstances, that the continued detention of appellant was not unreasonable under the Fourth Amendment. *See Sharpe*, 470 U.S. at 686–88, 105 S. Ct. 1575–76.

Accordingly, we further hold that the trial court did not err in denying appellant's motion to suppress all evidence obtained as a result of Officer Muskiet's detention of her.

We overrule appellant's first issue.

## Blood Specimen

In her second issue, appellant argues that the trial court erred in denying her motion to suppress the blood specimen taken from her because it was obtained with a warrant that was "issued based upon material misrepresentations and omissions in Officer Sanchez's affidavit; including false statements regarding imaginary standardized field sobriety testing[,] along with elevated scoring of standardized field sobriety tests." She asserts that, once these "false statements are removed from the affidavit . . . [and] the material omissions" made by Sanchez are considered, the affidavit fails to contain sufficient facts to establish probable cause for the issuance of a warrant." The State responds that Sanchez did not intentionally, knowingly, or with reckless disregard for the truth include inaccurate information in her affidavit, the omitted information of which appellant complains was not necessary, and facts establishing sufficient probable cause exist in the affidavit to support the magistrate's decision to issue the warrant.

Law enforcement personnel may obtain a defendant's blood for a DWI investigation by search warrant. *Beeman v. State*, 86 S.W.3d 613, 616 (Tex. Crim.

15

App. 2002). The Fourth Amendment requires that "[n]o warrants shall issue, but upon probable cause, supported by [o]ath or affirmation." U.S. CONST. amend IV; *see also* TEX. CODE CRIM. PROC. ANN. art. 1.06 (Vernon 2005). A search warrant may be obtained from a magistrate only upon submission of an affidavit setting forth substantial facts establishing probable cause. TEX. CODE CRIM. PROC. ANN. art. 18.01(b) (Vernon Supp. 2013). The affidavit must set forth specific facts establishing that a specific offense has been committed, the item to be seized constitutes evidence of the offense or evidence that a particular person committed the offense, and that the item is located at, or on the person, place, or thing to be searched. TEX. CODE CRIM. PROC. ANN. art. 18.01(c).

When a magistrate construes a probable cause affidavit, he is permitted to "interpret the affidavit in a non-technical, common-sense manner and may draw reasonable inferences from the facts and circumstances contained within its four corners." *State v. Jordan,* 342 S.W.3d 565, 569 (Tex. Crim. App. 2011). On a complaint that evidence obtained during a search should be suppressed because the magistrate had no probable cause to issue a search warrant, we apply a "great deference" standard of review to the magistrate's determination of probable cause. *Id.* "Probable cause exists if, under the totality of the circumstances set forth in the affidavit before the magistrate, there is a 'fair probability' that contraband or evidence of a crime will be found in a particular place at the time the warrant is

issued." *Id.* at 568–69. In our review of the magistrate's determination, we determine whether "'the magistrate had a substantial basis for concluding that probable cause existed.'" *Id.* at 569 (quoting *Illinois v. Gates*, 462 U.S. 213, 236, 103 S. Ct. 2317, 2331 (1983)). And we employ a totality-of-the-circumstances analysis. *Gates*, 462 U.S. at 230–37, 103 S. Ct. at 2328–31. The Texas Court of Criminal Appeals has explained, "The issue is not whether there are other facts that could have, or even should have, been included in the affidavit;" instead "we focus on the combined logical force of the facts that *are* in the affidavit . . . ." *Rodriguez v. State*, 232 S.W.3d 55, 62 (Tex. Crim. App. 2007). And the truthfulness of the factual showing providing probable cause for a warrant does not mean "'truthful[ness]' in the sense that every fact recited in the warrant affidavit is necessarily correct." *Franks v. Delaware*, 438 U.S. 154, 165, 98 S. Ct. 2674, 2681 (1978). "[S]o long as the magistrate had a 'substantial basis for . . . conclud[ing]' that a search [warrant] would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Gates*, 462 U.S. at 236, 103 S. Ct. at 2331 (alteration in original).

Officer Sanchez obtained a search warrant for a blood specimen from appellant, and attached to the warrant was an affidavit that she prepared. In her affidavit, Sanchez testified that she is a certified peace officer; she, during her employment, had observed "numerous people who [were] under the influence of

alcohol or other substances"; and she had reason to believe that appellant had operated a motor vehicle in a public place while intoxicated. She explained that her opinion was based on the observations of Officers Muskiet and Gautreaux, and her personal observations:

> In this case, March 25, 2012, at 0225 am, Officers Muskiet and Gau[t]reaux observed [appellant] operating a motor vehicle at 3400 Edloe, a public place in Harris County, Texas. The officers observed her run a red light and initiated a traffic stop. They made contact with [appellant] and noticed [a] strong odor of alcoholic beverage, red eyes, and slurred speech.
>
> I arrived at the scene, came into contact with [appellant] and noticed the strong odor of alcoholic beverage, red eyes, and slurred speech.
>
> [Appellant] admitted to drinking two drinks of vodka and soda.

She also included in the affidavit details concerning the field sobriety tests that the officers administered to appellant:

> I asked [appellant] to perform some field sobriety tests to determine [appellant's] level of intoxication, including the [HGN], One Leg Stand[,] and Walk and Turn. I use these tests frequently and find them to be accurate and reliable indicators of intoxication or lack thereof and have arrested many people based on their poor performances on these tests (as well as having released many people based upon their satisfactory performance on these tests).
>
> I observed [appellant] to have 6 out of 6 clues on the HGN test. I did not do any more tests at the scene. At the station, Officer McRae performed standardized field sobriety tests and observed 6 out of 6 [clues] on HGN, 2 out of 4 clues on the one leg stand, and 3 out of 8 clues on the walk and turn. Officer McRae also asked [appellant] to recite the alphabet from K to X, and [appellant] was able to get "KLMNOPQRX."

Appellant asserts that the above statements about the results of the field sobriety tests are false, and she argues that because she has made a "preliminary showing that the false statements were made either knowingly and intentionally, or with reckless disregard [for] the truth," "the trial court should have excised them from the affidavit."[5]  And appellant asserts that Officer Sanchez conceded that her statements were "false," making the trial court's finding that the statements were not made intentionally and knowingly, or with reckless disregard for the truth, to be "against the weight of the evidence."  Appellant further asserts that Sanchez, in her affidavit, omitted sixteen material facts that the magistrate needed to make a probable cause determination, including "[t]he total investigation time by Sanchez," "[t]hat the arrest location was [a]ppellant's own apartment complex," and a "description of [a]ppellant's vehicle."

Viewing the statements made within the four corners of Officer Sanchez's affidavit in a common sense, non-technical manner, we conclude that the affidavit provided the magistrate with enough information to allow an independent conclusion that a fair probability existed that a "search" of appellant's blood would

---

[5]   If a defendant establishes by a preponderance of the evidence that an affiant, in an affidavit in support of a search warrant, made false statements knowingly and intentionally, or with reckless disregard for the truth, and the false statements are material to the establishment of probable cause, the false, material statements must be excised from the affidavit. *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S. Ct. 2674, 2676 (1978); *Harris v. State*, 227 S.W.3d 83, 85 (Tex. Crim. App. 2007).

reveal evidence of a crime. *See Jordan*, 342 S.W.3d at 568–69; *Rodriguez*, 232 S.W.3d at 62. Although the trial court did not conduct a separate *Franks* hearing, it specifically found that "[t]he testimony and evidence did not" show that "the officer intentionally or knowingly, [or] with reckless disregard for the truth . . . attempt[ed] to mislead the magistrate."

"An affidavit supporting a search warrant begins with a presumption of validity; thus, the defendant has the burden of making a preliminary showing of deliberate falsehoods in that affidavit before he is entitled to a *Franks* hearing." *Cates v. State*, 120 S.W.3d 352, 355 (Tex. Crim. App. 2003). The Fourth Amendment does not mandate that every statement made in an affidavit supporting a search warrant be necessarily correct. *See Franks*, 438 U.S. at 164–65, 98 S. Ct. at 2681. A misstatement made that is merely the result of simple negligence or inadvertence will not render invalid the search warrant upon which the affidavit is based. *Dancy v. State*, 728 S.W.2d 772, 782–83 (Tex. Crim. App. 1987) (noting that misstatement in affidavit resulting from mere negligence in checking or recording facts relevant to probable cause "is beyond the pale of *Franks*").

Here, Officer Sanchez testified at trial that she had mistakenly said in her affidavit that she had offered "some" field sobriety tests to appellant; in fact, she had only administered the HGN test to appellant at the scene. Officer McRae actually administered the other sobriety tests to appellant at Central Intox. We

note that Sanchez in her affidavit did correctly state that after she had observed six out of six clues on the HGN test and she did not administer any additional tests at the scene. Also, although Sanchez stated, in her affidavit, that McRae had observed six out of six clues on the HGN test, this was incorrect. However, the trial court could have reasonably concluded that this was a simple mistake because Sanchez had actually administered the test to appellant at the scene. Sanchez also explained that she had mistakenly stated in her affidavit that McRae had observed two out of four clues on the one-leg stand and three out of eight clues on the walk-and-turn test. In fact, McRae had only observed one out of four clues on the one-leg stand and two out of eight clues on the walk-and-turn test.

The trial court was free to believe Officer Sanchez's explanations that she had mistakenly made misstatements in her affidavit, and it, thus, rejected appellant's assertions that Sanchez's misstatements were deliberate falsehoods. *See generally Franks*, 438 U.S. at 155–56, 98 S. Ct. at 2676 (establishing that defendant must show "perjury or reckless disregard . . . by preponderance of the evidence"). And the trial court's findings and conclusions regarding Sanchez's affidavit are supported by the record. *See Dancy*, 728 S.W.2d at 782–83. Accordingly, we conclude that the trial court could have reasonably found that Sanchez's misstatements were made negligently and not intentionally, knowingly, or with reckless disregard for the truth.

21

Finally, in regard to appellant's complaint that Officer Sanchez's affidavit omits certain facts, it is well established that an affidavit made in support of a search warrant must set "forth substantial facts establishing probable cause." TEX. CODE CRIM. PROC. ANN. art. 18.01(b). However, this does not require that an officer provide a laundry list of certain facts to establish probable cause in a search warrant affidavit; rather, the statute more generally requires that a search warrant affidavit contain enough information to allow a magistrate "to independently determine probable cause." *Rodriguez*, 232 S.W.3d at 61. We conclude that the facts contained in Sanchez's affidavit would lead an "untrained, common person" to believe that appellant was driving a motor vehicle while intoxicated. *See Hogan v. State*, 329 S.W.3d 90, 96 (Tex. App.—Fort Worth 2010, no pet.); *see also Brinegar v. United States*, 338 U.S. 160, 175, 69 S. Ct. 1302, 1310 (1949).

We overrule appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.

Terry Jennings
Justice

Panel consists of Justices Jennings, Bland, and Massengale.

Do not publish. TEX. R. APP. P. 47.2(b).